IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2020

## STATE OF TENNESSEE v. CHRISTOPHER W. GADSDEN

**Appeal from the Criminal Court for Davidson County**
**No. 2017-B-1186    Steve R. Dozier, Judge**

_____

### No. M2019-01385-CCA-R3-CD

_____

Defendant, Christopher W. Gadsden, was indicted by the Davidson County Grand Jury for first degree premeditated murder, first degree felony murder, and theft of property valued between $1,000 and $10,000. Following a jury trial, Defendant was convicted of second degree murder and theft of property valued between $1,000 and $10,000. Following a sentencing hearing, the trial court imposed a total effective sentence of 24 years in the Tennessee Department of Correction with 100 percent release eligibility. In this appeal as of right, Defendant contends that: 1) the evidence was insufficient to support his conviction for second degree murder; 2) the trial court erred by admitting certain autopsy photographs into evidence; 3) the trial court erred by excluding evidence of a prior bad act by the victim; and 4) his sentence is excessive. Following our review of the entire record and the briefs of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Martesha L. Johnson, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Will Allensworth and Jared Mollenkoff, Assistant Public Defenders (at trial), for the appellant, Christopher W. Gadsden.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chandler Harris and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Evidence at trial*

On November 13, 2016, the victim, Deon Brown, called his mother, Joice Seay, around 2 p.m. to inform her that he was returning to Nashville after performing in a drag show in Memphis. When Ms. Seay returned home from work around 4 p.m., the victim was asleep. Later that evening, the victim told Ms. Seay that he was going to visit a friend, and he left the house wearing "stone-washed jeans and a jacket with some fringes on it." The victim did not return home that evening. The following day, Ms. Seay learned that the victim had been stabbed to death.

Charity Everett testified that she had been friends with the victim since 2012. On November 14, 2016, Ms. Everett learned that the victim had been killed. Ms. Everett went to the car dealership where the victim had purchased his vehicle and, using a GPS locator, she discovered that the victim's vehicle was in Hickory, North Carolina. Ms. Everett contacted the Hickory Police Department.

Officer Kristen Morgan, of the Metro Nashville Police Department, responded to the Western Express trucking company at 6:33 a.m. on November 14, 2016. She observed a body in the back area of the parking lot. She testified that there was an "extensive amount of blood around the body" and a trail of blood leading back to "some of the trucks[.]"

Detective William Stokes was the lead detective in this case. When he arrived at the scene, he observed the victim "face up on the ground, . . . wearing high he[e]led shoes and what appeared to be women's clothing." Detective Stokes testified that in the area of the victim's body, there was a "circular blood trail, it was a large closed circle with a large void in the middle." He testified that the "assumption of that time, you know, there was something there, some object was there that was mobile, i.e., a vehicle."

Officer Caleb Foster took photographs of the crime scene. He also collected DNA from the blood stains on the ground near the victim's body. Officer Foster observed drops of blood on the pavement between two parked trucks. The victim's pants pockets had "been pulled out a little bit." The victim was wearing high-heeled shoes, and the heel of his left shoe was broken. In the area around the victim's body, Officer Foster observed tassels from the victim's jacket, bracelets, and a wig. Officer Foster found a bag of condoms in the victim's jacket pocket.

Officer Foster observed that none of the trucks parked around the victim's body were locked. Employees of Western Express had noticed that one of the trucks appeared

- 2 -

as if someone had been living in it. Officer Foster investigated the interior of the truck and found "clothing items, food items[,] and [ ] condom wrappers inside the truck." Officer Foster testified that the truck, number 1138, was in the row of trucks behind the row nearest to the victim's body. The driver's side door of truck 1138 was open when Officer Foster began investigating it.

David Bohler, an employee of Western Express, explained that the location was a "terminal building[,]" and the area where the victim's body was found was an area where unassigned trucks were kept. Mr. Bohler also explained that a "series" of unassigned trucks can all be unlocked using one master key. Charlie Haines, another employee of Western Express, testified that Defendant was a former employee of the Western Express trucking company and that his employment ended on July 8, 2015. Mr. Haines testified that the parking lot where the victim's body was found was "far away" from the Western Express office.

Bill Dover, who owned a tow truck company in Campton, North Carolina, testified that one of his employees, Gary Rinehart, responded to the scene of a wreck in which Defendant was involved, on November 14, 2016. Mr. Rinehart called Mr. Dover to report that Defendant had injured his hand and was bleeding badly. Mr. Dover called the authorities and responded to the scene. When he arrived, he spoke to Defendant, who stated that he had injured his hand on the vehicle's fender when he tried to change a flat tire on the vehicle. Mr. Dover testified that Defendant had "run into the bridge there at Exit 20" and continued to drive the vehicle for "about a half mile[.]" Mr. Dover testified that he could "tell it wasn't a flat tire." Mr. Dover observed that the vehicle's right front wheel was "tor[n] off" and the right front fender was damaged. Mr. Dover did not see any blood around the front fender. He testified that "[a]ll of the blood was on the back of the car, you know, around the car, there was no blood at the front of the car." Defendant refused medical attention. Mr. Rinehart transported Defendant's vehicle to Hickory, North Carolina. Defendant refused to ride in the tow truck, and instead, he rode in his wrecked vehicle while it was being towed.

Officer Robert Helton, of the Hickory, North Carolina Police Department, was on patrol on November 14, 2016. He stopped at the Covered Express gas station in Hickory at around 10:00 a.m. Mr. Rinehart approached Officer Helton inside the store. Based on his conversation with Mr. Rinehart, Officer Helton exited the store and observed a white Pontiac G6 that was off of the tow truck. Defendant was walking around the vehicle. Defendant approached Officer Helton, and Officer Helton observed that Defendant "had an ashy gray pallor," which indicated that Defendant "had most likely suffered significant blood loss." Officer Helton also observed "a reddish brown stain" on the front of Defendant's green jacket, and Defendant was holding his right arm in front of him rather than in the sleeve of his jacket. Officer Helton testified that Defendant was "somewhat

struggling to make coherent statements." Officer Helton called for emergency medical services. Defendant told Officer Helton that he was "trying to fix his tire and the axle was spinning and it cut his hand."

Officer Helton observed that "the front right wheel was off of the vehicle." He also observed "blood droplets on the passenger side of the vehicle, on the hood of the vehicle and on the driver's side of the vehicle." Officer Helton also observed "a pool of blood around the center console" of the vehicle and a purple dress and a purse in the passenger seat. Officer Helton checked to see if the vehicle was stolen, and it was not. Defendant was transported to a local hospital by EMS. Officer Helton went to the hospital later that day to investigate an unrelated case, and he saw Defendant "staring at [him] from a room in the emergency room." Officer Helton "locked eyes" with Defendant, and Defendant "looked down and began pacing the room." Officer Helton observed that Defendant's hand was bandaged. Officer Helton testified that Defendant approached him in the parking lot of the emergency room, and Defendant thanked him for helping him.

On the following day, at approximately 10:24 a.m., Officer Helton received a dispatch call requesting an officer respond to an apartment complex approximately one-quarter of a mile from the gas station where Defendant's vehicle had been left. The dispatcher stated that an officer "was to respond to that area and look for a white Pontiac G6 with a Tennessee license plate." Officer Helton recognized the vehicle description and returned to the gas station. Officer Helton learned that family members of the vehicle's owner had tracked the vehicle using GPS. The vehicle was transported to the Hickory Police Department.

Officer Bea Davis, of the Hickory Police Department, was called to assist Officer Helton at the gas station on November 14, 2016. She had received a report "about a man who – he needed rescue." When she arrived, she observed Defendant sitting on the sidewalk in front of the gas station. Defendant appeared "very, very pale" and he looked like "he was going to pass out." Defendant told Officer Davis that his tire had "blown out" and that he cut his hand when he put his hand "in the wheel well while the axle was still going." Officer Davis testified that Defendant was "going in and out of consciousness" and was having difficulty speaking. Officer Davis's interaction with Defendant was recorded by her body camera and was played for the jury at trial.

On November 16, 2016, investigators from the Metro Nashville Police Department traveled to Hickory to retrieve the victim's vehicle. After seeing the blood spattered on the victim's vehicle, Detective Stokes theorized that the vehicle had been parked in the circular blood trail at the crime scene. Officer George Bouton testified that "there were specks of blood all over the [victim's] vehicle, all around it." He testified there were

- 4 -

blood droplets "[f]rom the trunk all the way up to the hood of the vehicle and then there was a lot of blood on the inside of the vehicle." Officer Bouton collected swabs of blood from the vehicle. He also collected two condoms from the front passenger seat and a shirt and underwear that appeared to have blood on them from the front passenger floorboard. Officer Bouton also collected a knife from the front driver's side floorboard. The knife had blood on it. He dusted the vehicle for latent fingerprints.

Defendant was arrested in New York. Officer Mark Mittermeier testified that in November, 2016, he learned that Defendant "was trying to leave the country." Inspector Sandy Rao, of the United States Marshals Office, located Defendant at an apartment in the Mount Vernon area of New York City. Inspector Rao testified that she knocked on the apartment door, and "[a] person matching the description of [Defendant] opened the door and then slammed the door." Inspector Rao and other law enforcement officers attempted to force entry into the apartment, but another occupant opened the door. Officers then entered the apartment and arrested Defendant.

Rachel Mack, a forensic scientist with the Metro Nashville Crime Lab, conducted DNA analysis on several items collected in this case. She determined that a mattress cover found inside truck number 1138 contained a mixture of non-sperm DNA from two individuals. Ms. Mack testified that Defendant and the victim were both possible contributors. Ms. Mack analyzed swabs taken from the victim's vehicle and swabs taken from the crime scene at the Western Express location, and she concluded that those items contained the victim's DNA. Ms. Mack also found the victim's DNA on the white fringe found at the crime scene. She found Defendant's DNA on portions of the seats removed from the victim's vehicle, a swab from the front passenger door handle of the vehicle, a stain on the sleeve of the victim's jacket, and a stain on Defendant's cell phone. Ms. Mack also tested the condoms found inside the semi-truck at the crime scene and the knife found inside the victim's vehicle and concluded that those items contained both the victim's and Defendant's DNA.

Terrence Evans testified that he had known Defendant since middle school. In November, 2016, Defendant called Mr. Evans and asked him to pick him up from the hospital in Hickory, North Carolina. Defendant told Mr. Evans that he had "totaled [his] truck" and that he had lost his job. Mr. Evans, his brother, his sister, and a friend drove from Fayetteville, North Carolina to Hickory to pick up Defendant. Mr. Evans testified that Defendant's hand was bandaged and "it kept bleeding." Defendant told the other individuals in the vehicle that he had gone "through the windshield" of his truck during the wreck. Defendant spent the night at Mr. Evans' residence, and the following day, Mr. Evans drove him to downtown Fayetteville. After Mr. Evans dropped off Defendant, he learned about the victim's murder, and he went to the Fayetteville Police Department to

inform them of his involvement. Defendant did not tell Mr. Evans that he had been in a fight or that he had been attacked with a knife.

Detective Chad Gish analyzed the Defendant's cell phone. He identified a text message conversation between Defendant and the victim from November 12-13, 2016, in which Defendant invited the victim to meet him at the Western Express location. On November 13, 2016, Defendant called the victim at 6:44 p.m. Defendant missed a call from the victim at 8:30 p.m., but he answered calls from the victim at 8:31 p.m. and 8:50 p.m. Defendant called the victim at 8:54 p.m. Detective Gish also compiled a timeline of Defendant's cell phone activity on November 13-14. He noted a gap in activity from 12:33 a.m. to 4:47 a.m. on November 14. From 4:55 a.m. to 5:17 a.m., on November 14, Defendant conducted internet searches for vehicle towing services.

Dr. Emily Dennison, an assistant medical examiner for Davidson County, performed an autopsy on the victim. The victim was 24 years old at the time of his death. He died from stab wounds, and the manner of his death was homicide. Dr. Dennison observed abrasions on the victim's left forehead, left cheek, left buttock, right buttock, and left elbow. The victim had 21 sharp force injuries, including 19 stab wounds and two incised wounds. The victim suffered two stab wounds to the back of his head, which penetrated his skull, and the remaining wounds were to the victim's neck and shoulder. One of the stab wounds was to the right side of the victim's neck and was 18 centimeters deep. This wound severed a large muscle, the right jugular vein, the carotid artery, the front of the esophagus, the back of the trachea, the anterior cervical spine, and the left jugular vein. Because this wound severed several major blood vessels, this wound caused the victim to "lo[se] a lot of blood fairly quickly." A toxicology report revealed that the victim did not have any drugs in his body.

Defendant admitted at trial that he killed the victim. He testified that he arrived in Nashville on November 10, 2016, after having been arrested for possessing marijuana in Mississippi while working for Carolina Cargo. Defendant traveled to the Western Express terminal location, where he had been previously employed. On the evening of November 10, 2016, Defendant used the "Tagged" application on his phone to exchange messages with the victim. They planned to meet when the victim returned to Nashville from Memphis. On November 12, 2016, Defendant broke into truck number 1138 using a master key he obtained during his previous employment. Defendant testified that he and the victim planned to meet to have sex on November 13, 2016. When the victim arrived at the truck terminal, Defendant and the victim had sex inside truck 1138. Defendant testified that he did not know that the victim possessed a knife.

Defendant testified that the victim got dressed quickly and seemed to be in a hurry. Defendant noticed that his wallet was missing, and he asked the victim if he had

taken it. The victim told Defendant that "he needed to be paid for his services." The victim then exited the semi-truck. Defendant testified that his wallet contained over $600 cash, his "social security card, [his] bank cards, and [his] driver's license." Defendant "started to panic" when the victim left with his wallet. Defendant followed the victim to the victim's vehicle and "yelled at him several times." Defendant "walked up on" the victim, and the victim "turned around with a knife in his hand." Defendant testified that the victim "jabbed" the knife at him, but the knife did not make contact with Defendant. Defendant testified, "I feared for my life and I was angry." He testified that he was "enraged" at that point. Defendant punched the victim, and the victim stumbled and dropped the knife. Defendant then picked up the knife and stabbed the victim in his throat. The victim remained standing, and Defendant stabbed him again. Defendant testified that he only remembered stabbing the victim "[t]hree or four times." Defendant admitted on cross-examination that he stabbed the victim so hard that the knife handle penetrated the victim's neck.

Defendant testified that after being stabbed, the victim "stumbled to the passenger side of his car" and tried to open the door, but the door was locked. The victim then collapsed. Defendant then realized that he had cut his hand while he was stabbing the victim. Defendant retrieved his wallet and keys from the ground and his personal items from the semi-truck. Defendant testified that he decided to take the victim's vehicle "[a]fter [Defendant] realized [the victim] was dead." He testified that he "decided to drive to North Carolina where [his] parents live."

Defendant acknowledged that he lied to several people about how he injured his hand. He testified that he was "[t]rying not to give [him]self away." Defendant testified that "the tow truck driver made the assumption that [he] cut [his] hand when the wheel barrel [sic] was turning." Defendant denied that he told him that was the cause of his injury. He testified that he rode inside the wrecked vehicle while it was being towed because "[t]hey told [him] that [he] was bleeding too much." Defendant slept in a vehicle in front his uncle's house in Fayetteville before fleeing to New York. Defendant used a friend's credit card to purchase his bus ticket from North Carolina to New York. Defendant acknowledged that he took measures to avoid arrest because he "didn't want to go to jail." He testified that he only told his brother and a friend that the victim had attempted to rob and stab him. Defendant testified, "[a]fter having two years to think about it," his response to the victim's aggression was not reasonable.

Phillana Majors testified about an incident between the victim and her cousin, Cornelius Phillips, that occurred in June, 2007, at Opry Mills Mall. Ms. Majors testified that the victim ran up behind Mr. Phillips and struck him in the back of the head. She testified that Mr. Phillips fell into a glass door and lost consciousness. Ms. Majors testified that she did not know the victim, and she acknowledged that the victim was a

juvenile at the time of the incident. Mr. Phillips testified that he went to school with the victim and they were friends. Mr. Phillips testified that he and the victim had a dispute, and he acknowledged that the victim struck him and he lost consciousness. Mr. Phillips testified that the victim did not possess a weapon or attempt to steal from him. He testified that he was not afraid of the victim. Mr. Phillips testified that he was 16 years old at the time of the incident.

Jeremy Taylor testified about an altercation he had with the victim when they were in high school. He testified that in January, 2009, the victim and "two other females" went to his residence, and they "[g]ot into an argument." Mr. Taylor testified that the victim "just pretty much started swinging" and they "both started fighting in the middle of the street." Mr. Taylor testified that he and the victim had been having disputes at school for two or three months prior to the incident.

Christopher Morrison, a loss prevention manager at Target, testified that on February 1, 2010, he and another employee attempted to stop the victim from leaving the store by grabbing the victim and pulling him to the floor. Mr. Morrison testified that during the struggle, the victim punched another individual in the face. Bryan Campbell, a loss prevention manager at Kroger, testified that he had an encounter with the victim in November, 2011. Mr. Campbell attempted to prevent the victim from leaving the store, and the victim "hit [him] in the face and then took off." Kimberly Sanders, a manager at Saks Off 5th Avenue, testified that from 2012 to 2014, the victim had a reputation for theft. She testified that she learned from a loss prevention investigator for the store that the victim had been apprehended for shoplifting at the store. Ms. Sanders acknowledged that she had "never physically seen" the victim.

Sergeant Joel Bontrager, of the Metro Nashville Police Department, testified that he investigated an incident involving the victim in January, 2013, and he testified that based on his interviews of other individuals, the victim had a reputation for theft. Sergeant Bontrager also acknowledged that he had never had any personal contact with the victim.

The State called several witnesses in rebuttal to testify about the victim's reputation for peacefulness. Sanchez Horton testified that he had known the victim since 2008, and he and the victim were "best friend[s]." He testified that the victim was not an aggressive person and that the victim "normally didn't just [ ] pick a fight, [ ] unless someone agitated or picked with him first," but that the victim would "defend himself" against another aggressor. Mr. Horton testified that "[e]veryone loved [the victim]." He also testified that the victim "never carried any knife, no weapon, no nothing [sic]."

Lakenya Anderson testified that she met the victim in 2012 or 2013 when they worked together. She testified that she spent a lot of time with the victim outside of work, and the last time she saw the victim was on October 8, 2016. Ms. Anderson testified that she had never known the victim to carry a knife or other weapon. Jasmine Majors testified that she had known the victim "all of [her] life." She testified that the victim was a peaceful person, and he "always ma[de] every[]one around him just smile and laugh, that's just who he was." She never knew the victim to carry a weapon. Fredrick Smith testified that she met the victim in sixth grade. She knew the victim to be a "sweet, caring" person. She testified that she never knew the victim to carry a knife or other weapon. Ashley Jefferson testified that she was married to the victim's cousin, and she met the victim in 2008. She also testified that she knew the victim to be a peaceful person, and she never saw the victim carry a knife or other weapon.

### Sentencing hearing

At Defendant's sentencing hearing, Ms. Seay, the victim's mother, testified that the victim's death changed her life, as well as the lives of the victim's father and brother. She testified that her oldest son died in an accident six months prior to the victim's murder, and that "this one was different because our son['s] life was snatched from him by an individual who was insensitive." She testified that the victim was a "funny, loving, [and] caring[,] and he had a bright future ahead of him." Ms. Seay testified that the "heinous" circumstances of her son's death caused her to feel "hurt[,] [s]ad[,] [and] [b]roken." Ms. Seay requested that the trial court impose the maximum sentence.

In a victim impact statement, Charity Everett stated that the victim "would have never stolen anything from anyone." She stated that the victim "worked hard for everything he had earned in his life" and that "[h]e had so much more to accomplish in his life." Ms. Everett expressed her anger at Defendant and stated, "[y]ou could have fought him like a man. You did not have to stab him in the brutal[,] horrific and vicious way that you did." She also noted that Defendant did not seek medical attention for the victim, that he "took what [he] needed and wanted from [the victim]'s lifeless body", and that he "left [the victim] in the freezing cold, all alone, like he was nothing." Ms. Everett also requested that the trial court impose the maximum sentence.

Defendant's father, Allen Gadsden, testified that he was retired from the United States Army. He testified that Defendant's mother died from breast cancer when Defendant was four years old. Mr. Gadsden testified that Defendant had a tumultuous relationship with the mother of Defendant's son.

In a written sentencing order, the trial court noted that it had considered the requisite statutory factors and found the following enhancement factors applicable: 1)

that Defendant treated the victim with exceptional cruelty during the commission of the offense; 2) that Defendant possessed or employed a deadly weapon during the commission of the offense; and 3) that Defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense. The trial court concluded that none of Defendant's proposed mitigating factors applied. The trial court merged Defendant's two second degree murder convictions and imposed a sentence of 24 years in count one and a sentence of four years in count three. The trial court ordered Defendant's sentences to run concurrently for a total effective sentence of 24 years' confinement with 100 percent release eligibility. The trial court concluded that Defendant's sentences were "justly deserved in relation to the seriousness of the offenses."

## *Analysis*

### *Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to support his conviction for second degree murder. He asserts that the jury should have convicted him of the lesser included offense of voluntary manslaughter because, Defendant argues, he "acted in a state of passion produced by adequate provocation sufficient to lead him to act in an irrational manner." The State asserts that the evidence was sufficient to support Defendant's conviction.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id*. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Second degree murder is defined as a "knowing killing of another." T.C.A. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(b). By contrast, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id*. § 39-13-211(a). Following the 1989 revision to the criminal code, the "essential element" that now separates second degree murder from voluntary manslaughter "is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'" *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001) (quoting T.C.A. § 39-13-211(a)).

Tennessee appellate courts have consistently held that state of passion produced by adequate provocation is an essential statutory element of the offense of voluntary manslaughter and not a mere defense to second degree murder. *See State v. Paul Clifford Moore, Jr.*, No. E2015-00585-CCA-R3-CD, 2016 WL 2865759, at *14 (Tenn. Crim. App. May 12, 2016), *perm. app. denied* (Tenn. Sept. 22, 2016) (citations omitted). Although Defendant claims that the evidence presented at trial established that he killed the victim in a state of passion that was produced by adequate provocation to cause him to act in an irrational manner, we disagree.

The evidence showed that after having sex, Defendant believed that the victim took his wallet. Defendant followed the victim through the parking lot, and the victim confronted Defendant with a knife. Defendant punched the victim, and the victim dropped the knife. Defendant then picked up the knife and stabbed the victim in the neck. Defendant admitted that he stabbed the victim so hard that part of the knife handle penetrated the victim's neck. Defendant continued to stab the victim. After Defendant stabbed the victim 21 times, the victim attempted to get in his vehicle, but it was locked, and the victim collapsed near his vehicle. The evidence showed that the victim was stabbed twice in his head, and those wounds penetrated his skull and would have bled significantly. The victim also sustained 16 stab wounds and two incised wounds to the back of his neck and one stab wound to his shoulder. Forensic evidence presented at trial confirmed many elements of the encounter between Defendant and the victim. Defendant admitted that he fled the scene and that he lied about his injury. He also admitted that he took measures to avoid arrest. Defendant also agreed that his response to the victim's aggression was not reasonable.

Based on this evidence, a rational jury could have found beyond a reasonable doubt that Defendant committed a knowing killing rather than a killing due to adequate provocation. *See Williams*, 38 S.W.3d at 539 (stating that the jury's decision to reject the

notion of provocation was well within its prerogative); *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' or a killing due to 'adequate provocation' is a question for the jury."). The trial court instructed the jury as to voluntary manslaughter, as well as other lesser-included offenses, and the jury rejected Defendant's argument that he committed voluntary manslaughter. Selecting between a second degree murder conviction and a manslaughter conviction "is within the exclusive province of the jury." *State v. Sentorya L. Young*, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *6 (Tenn. Crim. App. May 12, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008). Defendant is not entitled to relief on this issue.

*Admission of autopsy photographs*

Defendant contends that the trial court erred by admitting eight photographs of the victim's autopsy because, Defendant asserts, the photographs "were unnecessarily cumulative of other previously admitted photographs, they added nothing to the detailed testimony of the assistant medical examiner describing the injuries," and "[t]he prejudicial effect of the photographs far outweighed their probative value[.]" The State responds that the trial court properly admitted the photographs.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000)). Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951.

Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id*. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Id*. at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. *Banks*, 564 S.W.2d at 951. Autopsy photographs often fall into this category. *Id*. This is especially true when the defendant does not

dispute the injuries to the victim or cause of death. *See id*. at 952 (autopsy photographs not probative when the defendant did not dispute that the victim's death was caused by multiple wounds to the face and head). If the defendant does not dispute the testimony that the photographs illustrate, the more likely the prejudicial effect will substantially outweigh the photographs' probative value. *Id*. at 951.

Defendant filed a motion in limine seeking to exclude "[g]ruesome, irrelevant and prejudicial photographs of [the victim]'s body after his death and during his autopsy" and "[g]ruesome photos from the scene of the crime which are unnecessary and cumulative in a trial of this matter." During a jury-out hearing, Dr. Dennison testified that autopsy photographs help medical examiners describe a victim's injuries to the jury. She agreed that in a case where the victim sustained multiple wounds, photographs presented in combination with the autopsy report helped to reduce the jury's confusion. She testified that autopsy photographs assist the jury in understanding the size of wounds and their proximity to each other because medical examiners use rulers in the photographs. She also testified that photographs can also be helpful in describing the "edging" in different types of stab wounds. Dr. Dennison explained that two photographs of the same wound might be necessary because a closer photograph would show the wound in more detail, but "at the same time it's so close that you sort of lose the orientation and there is no number [to correlate the injury to the report]."

The trial court concluded that the autopsy photographs were probative of the victim's injuries, particularly "in terms of the number of injuries." The trial court noted that "the State, in this particular case, has no eyewitnesses to this particular crime. So in some respects[,] [the victim], through these photos[,] would be a witness to what happened to him back in November of 2016[.]" The trial court concluded that photographs would better describe and assist the jury's understanding of the victim's injuries than a diagram in the autopsy report. The trial court ruled as admissible into evidence 25 autopsy photographs and excluded 17 as duplicative. Additionally, the trial court admitted photographs of the victim's clothing, finding that there was "nothing overly gruesome" about those photographs.

There are eight autopsy photographs that Defendant argues were improperly admitted: 1) Exhibit 54E shows the back of the victim's head, depicting two stab wounds; 2) Exhibit 54F shows the side of the victim's right hand, which is covered in dried blood; 3) Exhibit 54G shows the palm of the victim's hand, which is covered in dried blood; 4) Exhibit 55A shows the victim's partially shaved head, exposing two stab wounds; 5) Exhibit 55C shows 12 wounds, which are numbered, on the victim's back and neck; 6) Exhibit 55D shows six wounds that are not numbered or marked on the victim's left shoulder; 7) Exhibit 55E shows a broader view of the victim's left shoulder, in which the

wounds are numbered; 8) Exhibit 55F shows the wound on the victim's neck with a ruler beside the wound.

The State asserts that these photographs were not cumulative of crime scene photographs depicting the same wounds because they helped the jury to understand the autopsy report. The State further asserts that there are significant differences between the crime scene photographs and the autopsy photographs of the victim's injuries. In the crime scene photographs, the victim was still clothed and his wounds had not been cleaned. The autopsy photographs show the victim's wounds more clearly and correlate to the medical examiner's report. The State also asserts that none of the autopsy photographs are particularly gruesome, and only two of the photographs show blood.

We conclude that the trial court did not err in admitting the eight autopsy photographs that Defendant challenges on appeal because they were relevant, probative of intent and premeditation, and not unfairly prejudicial. Because Defendant was charged with first degree premeditated murder, the State was required to prove that he intentionally killed the victim and that he acted with premeditation, and the challenged photographs, which depict the number and extent of the victim's injuries, were particularly probative of these issues. We note that Defendant admitted that he stabbed and killed the victim. Defendant testified at trial, however, that he only remembered stabbing the victim three or four times. Although Defendant did not dispute the victim's injuries or the cause of death, which lessens the probative value of the photographs, we also note that none of the photographs are particularly gruesome, which reduces the risk of undue prejudice.

We also conclude that the eight autopsy photographs were not cumulative because the photographs of the same injuries were taken at the crime scene. Defendant does not challenge the admission of the crime scene photographs. The autopsy photographs were not cumulative of the crime scene photographs because they depicted the victim's wounds in better detail and clarity and they assisted the jury in understanding the medical examiner's testimony at trial and the autopsy report. The autopsy photographs were also not cumulative of each other because they depict the victim's injuries from different perspectives.

Accordingly, because the probative value of the photographs is not substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion in admitting them. Defendant is not entitled to relief on this issue.

*Prior bad acts of the victim*

Defendant contends that the trial court erred in excluding evidence of prior bad acts of the victim that Defendant sought to introduce to corroborate his claim that the victim was the initial aggressor. Specifically, Defendant challenges the trial court's exclusion of evidence that the victim pleaded guilty to reckless endangerment with a deadly weapon in 2013. The State responds that the trial court did not abuse its discretion in excluding the evidence.

Prior to trial, Defendant filed a motion to admit "first aggressor and character evidence" of the victim. Defendant sought to admit evidence of the victim's reckless endangerment conviction stemming from an incident on January 17, 2013, in which Veronica Sherfield alleged that the victim almost struck her and her son with his vehicle when the victim was attempting to escape from loss prevention officers at the Opry Mills Mall. The victim pleaded guilty to reckless endangerment. Defendant filed a motion to admit a transcript of the victim's guilty plea submission hearing, at which the prosecutor gave a factual basis for the plea, and the victim entered a plea of guilty. Following Defendant's testimony at trial, the trial court conducted a jury-out hearing to consider Defendant's request.

The trial court ruled that the defense could present testimony from witnesses about specific instances of prior violent acts by the victim; however, the trial court excluded from evidence either an audio recording or a transcript of the victim's guilty plea submission hearing, finding that "[t]he fact of a conviction or arrest alone is inadequate to corroborate allegations that a victim may have been the first aggressor." The trial court also concluded that although the victim's acknowledgement of guilt at the plea submission hearing was a statement against his interest, "that doesn't mean that all of the facts from other declarants in that transcript would come in." On appeal, Defendant contends that the victim's "acknowledgement that he was guilty of the conduct recited by the prosecutor at the plea hearing" constitutes competent proof of the underlying facts of the alleged prior acts of aggression. We disagree.

A trial court has broad discretion regarding its decisions on the admissibility of evidence, and this court reviews those decisions under an abuse of discretion standard. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008); *State v. Looper*, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (citing *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on "a clearly erroneous assessment of the evidence," or employs "reasoning that causes an injustice to the complaining party." *Banks*, 271 S.W.3d at 116.

- 15 -

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). When a defendant relies on a theory of self-defense and that the alleged victim of a violence crime was the first aggressor, the defense may present evidence of the victim's prior history of violent conduct. *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Rogers*, 992 S.W.2d 393, 401 (Tenn. 1999). "The defendant need not be aware of the victim's prior violent acts at the time of the alleged self-defense in order to use the evidence for the limited purpose of corroborating the defendant's self-defense claim." *State v. Chancy Jones*, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 (Tenn. Crim. App. Apr. 5, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012) (citing *Ruane*, 912 S.W.2d at 781-782). Such evidence is only admissible as corroborative evidence and not substantive proof, and, thus, the admission of the evidence is not governed by Tennessee Rules of Evidence 404(a)(2) and 405. *See id*.; *Ruane*, 912 S.W.2d at 781-82; *see also* Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[5][d] (6th ed. 2011) (stating that the use of the victim's prior acts to corroborate the defendant's claim that the victim was the first aggressor "is not covered by Rule 404(a)(2), which deals with substantive rather than corroborative proof" and that as a result, "Rule 405(a) and (b) also do not appear to apply").

Defendant does not claim that the victim's prior criminal history was admissible as substantive evidence of Defendant's state of mind. Rather, Defendant maintains that such evidence was admissible to corroborate evidence that the victim was the initial aggressor. Based on *Ruane*, this court has recognized three prerequisites to the introduction of corroborative evidence of the victim's first aggressor tendencies: (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis underlying the defendant's claim that the victim had first aggressor tendencies; and (3) the trial court must determine whether the probative value of the evidence is outweighed by the danger of unfair prejudice. *Ruane*, 912 S.W.2d at 781 (citing *State v. Laterral Jolly*, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993), *perm. app. denied* (Tenn. May 16, 1994)); *see State v. Wayne Robert Wait*, No. E2010-01212-CCA-R3-CD, 2011 WL 5137178, at *12 (Tenn. Crim. App. Oct. 28, 2011), *perm. app. denied* (Tenn. March 7, 2012).

This court has recognized that "before evidence of first aggressiveness is relevant, some evidence must be introduced which would raise an issue as to who was the first aggressor." *Laterral Jolly*, 1993 WL 523590, at *3. Defendant testified at trial that after he and the victim had sex, the victim took Defendant's wallet and left. Defendant testified that he "started to panic" and followed the victim. He yelled at the victim to stop, and as he approached the victim, the victim turned around and jabbed a knife at

- 16 -

Defendant, but missed. Defendant testified that he feared for his life. We conclude that this evidence is sufficient to fairly raise the issue of the victim as the first aggressor.

As to the second factor, the defense sought to present the victim's prior conviction for reckless endangerment. The trial court recognized that "[t]he fact of a conviction or arrest alone is inadequate to corroborate allegations that a victim may have been the first aggressor. Instead the defendant must present competent proof of the underlying facts of the alleged prior acts of aggression." This court has stated, "[t]he mere fact that one has a conviction on his record, does not necessarily prove that he was the first aggressor, or that he even committed an aggressive act. For that matter, not all evidence of violent acts establish[es] evidence of aggression." *Id*. at *4. "It is conceivable that one could be involved in violent acts when he was not the original aggressor." *Id*. "Rather than considering the record of conviction alone, the trial court must determine the underlying facts of the alleged act of aggression." *Id*.

Defendant sought to establish the facts underlying the victim's prior conviction using the prosecutor's statement of facts from the victim's guilty plea submission hearing. This court has rejected the reliance upon the affidavits of complaint as competent proof of the underlying facts establishing that the victim was the first aggressor in the episode that led to the victim's prior arrests or convictions. *See L.B. Rittenberry, Jr. v. State*, No. M2016-00409-CCA-R3-PC, 2017 WL 1278677, at *6 (Tenn. Crim. App. Apr. 5, 2017). Defendant attempts to distinguish *Rittenberry* on the basis that *Rittenberry* and the cases cited in *Rittenberry* "involve no more than the bare proof of a prior conviction, without any underlying factual basis." However, the panel in that case held that the affidavit of complaint was not admissible for the purpose of proving the allegations contained therein. Similarly, we conclude that the prosecutor's factual basis at the guilty plea hearing is not admissible to prove the victim's prior act of aggression.

None of the alleged victims to the incident were offered to establish the facts of the incident to show that the victim engaged in an act of aggression. Although Defendant states in his brief, "it is clear that under *Ruane*, witnesses to the 2013 incident at Opry Mills – Mr. and Mrs. Sherfield and their son – would have been able to testify about the incident at trial to corroborate the defendant's testimony that the victim as the first aggressor," defense counsel advised the trial court at a pretrial hearing on Defendant's motion that he believed that the witnesses lived out-of-state, and he had been unable to subpoena them.

With regard to the third factor, the trial court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403. We agree with the trial court's conclusion. Defendant failed to present competent

- 17 -

evidence establishing the victim as the first aggressor with respect to the victim's prior conviction. Thus, Defendant failed to establish the second *Ruane* factor with respect to the victim's reckless endangerment charge. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant contends that his sentence is excessive. Specifically, Defendant asserts that the trial court erred in its application of enhancement and mitigating factors. The State responds that the sentence is not excessive.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

In this case, the record reflects that the trial court imposed a within-range sentence for each of Defendant's convictions. Defendant was convicted of second degree murder in count one, a Class A felony. *See* T.C.A. § 39-13-210(c)(1). The sentencing range for a Range I, standard offender convicted of a Class A felony is between 15 and 25 years. *Id*. § 40-35-112(a)(1). Defendant received a sentence of 24 years in count one. Defendant was also convicted of theft of property between the value of $1,000 and $10,000 in count three, a Class D felony. *See id*. § 39-14-105(a)(3). The sentencing range for a Range I, standard offender convicted of a Class D felony is between two and four years. *Id*. § 40-35-112(a)(4). Defendant received a sentence of four years in count three.

Defendant challenges the trial court's application of two enhancement factors: 1) that he treated the victim with exceptional cruelty; and 2) that he abused a position of private trust. *See* T.C.A. § 40-35-114(5), (14). Defendant also asserts that the trial court should have applied three mitigating factors: 1) that Defendant acted under strong provocation; 2) that Defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his criminal conduct; and 3) that Defendant had no prior criminal record. *See id*. § 40-35-113(2), (11). Defendant concedes that "he is unable to contest the weight given to any applicable enhancement factor found by the trial court." Defendant asserts, however, that his sentence "is greater than that deserved for the offense committed: and is "not the least severe sentence necessary to achieve the purpose for which it was imposed."

The trial court noted that Defendant testified that the first stab wound he inflicted on the victim was the stab to the victim's neck, which the medical examiner testified was the most severe of the victim's wounds. The court further noted, "[a]fter inflicting such a great injury, [ ] Defendant proceeded to stab the victim an additional twenty times, with many of those wounds being in the victim's back, as the victim apparently staggered around the parking lot trying to flee from [ ] Defendant." Additionally, the trial court noted that the medical examiner testified that the victim's injuries "would have been particularly painful, and that the victim would not have been able to breathe after being stabbed in the back." Accordingly, the trial court found that Defendant treated the victim with exceptional cruelty.

The trial court found that Defendant abused a position of private trust, noting that "[a]lthough . . . the relationship between [ ] Defendant and the victim was only in existence for a short period of time prior to the offense, the Court finds that [ ] Defendant was in a relationship with the victim that promoted confidence and faith." The court stated, "[r]egardless of the victim's [ ] lifestyle choices involving casual sexual encounters, the victim still placed trust in [ ] Defendant in meeting him in solitude and engaging in a sexual encounter with him." The trial court noted that Defendant chose the

- 19 -

location of their meeting, and he selected a location that was "remote and isolated[.]" Moreover, we note that Defendant was familiar with the location, and the victim was unfamiliar with it. We also note that although Defendant and the victim's encounter was brief, Defendant and the victim communicated by text message for two days prior to the meeting.

We conclude that the record supports the trial court's application of these two enhancement factors. The trial court also found that Defendant possessed a deadly weapon during the commission of the offense; however, Defendant does not challenge the trial court's application of that factor.

The trial court declined to apply as a mitigating factor that Defendant acted under strong provocation, noting that the jury rejected Defendant's argument that he acted in self-defense or under provocation. We conclude that the trial court's refusal to apply this mitigating factor is supported by the evidence. Defendant testified that the victim "jabbed" the knife at him, but that the knife did not strike him. After Defendant disarmed the victim and the threat was terminated, Defendant then stabbed the victim in the neck, causing severe, if not lethal, injury, and Defendant continued to stab the victim in the victim's upper back, neck, and head.

The trial court also declined to apply as a mitigating factor that Defendant murdered the victim under such unusual circumstances that Defendant did not have a sustained intent to violate the law. The trial court noted that the evidence at trial showed that Defendant stabbed the victim 21 times and "chased him around the parking lot in the course of killing him." The court further noted that Defendant stole the victim's vehicle, fled the state, and lied to law enforcement to avoid prosecution. Based on these facts, the trial court concluded that Defendant "had a sustained intent to violate the law." We agree.

Finally, Defendant contends that the trial court erred by not finding that Defendant's lack of a prior criminal record was a mitigating factor. The trial court agreed "that [ ] Defendant does not have a prior criminal record, and thus could be entitled to consideration of this as a mitigating factor." The court noted, however, that it was "not required to find that the absence of a prior record is a mitigating factor." Additionally, the trial court noted that Defendant "trespass[ed] at the Western Express lot for several days prior to these offenses.

We conclude that the trial court did not abuse its discretion in determining the length of Defendant's sentence. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Bise*, 380 S.W.3d at

706. Here, the trial court properly considered the circumstances of the offenses and imposed a within-range sentence that is consistent with the purposes and principles of sentencing. Defendant is not entitled to relief.

CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE